UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RENEÉ LOVE,

                 Plaintiff,

     -v-

NEW YORK STATE OFFICE OF MENTAL
HEALTH,

                 Defendant.

---

Case No. 03-CV-5809 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances:</u>
Ms. Reneé Love
New York, N.Y.
*Pro Se Plaintiff*

Michael E. Peeples, Esq.
Assistant Attorney General
State of New York
New York, N.Y.
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

     Plaintiff Reneé Love filed this action against Defendant New York State Office of Mental

Health ("NYOMH"), alleging discrimination in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e-2. Specifically, Plaintiff alleges that Defendant unlawfully terminated

her employment because of her race. Defendant moves for Summary Judgment and, for the

reasons stated in this opinion, Defendant's Motion is GRANTED.

I. Background

A. Factual History

     Kingsboro Psychiatric Center ("Kingsboro") is a hospital operated by Defendant

NYOMH for the care, treatment, and rehabilitation of the mentally ill. (Def.'s Stmt. of Material

Facts As to Which There is No Genuine Issue to Be Tried ("Def.'s 56.1") at ¶¶ 2-3.) Beginning

on December 7, 2000, Kingsboro employed Plaintiff Reneé Love, an African-American adult

female, as a Mental Health Therapy Aide Trainee. (*Id.* at ¶ 28.)

  Under New York Law, Kingsboro has an Executive Director who the law charges with

"the responsibility of seeing that there is humane treatment of the patients at his facility and

[with] investigat[ing] every case of alleged patient abuse or mistreatement." N.Y. Mental

Hygiene Law § 7.21(b). Pursuant to OMH regulations and to protect the health and safety of its

patients, Kingsboro maintains an Incident Management Policy (the "Policy"). (Def.'s 56.1 ¶¶ 8-

10; Aff. of Kin Wah Lee in Support of Def.'s Mot. for Summary Judgment ("Lee Aff."), Ex. A.)

The Policy requires that all allegations of patient abuse be promptly investigated. (*Id.* ¶ 11.)

Any reasonably reliable statement, made by a patient or by others, alleging that abuse may have

occurred constitutes an "allegation of abuse" triggering mandatory investigation. (*Id.* ¶ 12.)[1]

  Under the Policy, Kingsboro's Executive Director designates a Risk Manager, who is

required to have certain experience and to "have received formal training in basic and advanced

investigation techniques." (*Id.* 24; Lee Aff., Ex. A.) Throughout Plaintiff's tenure at the

Kingsboro, the designated Risk Manager was Maureen D. Geller ("Geller"). (Lee Aff. ¶ 6; Aff.

Of Maureen D. Geller in Support of Def.'s Mot. for Summary Judgment ("Geller Aff.") ¶ 1.)

  Most allegations of abuse are investigated by the Risk Manager, who does not supervise

---

[1] Under the policy, "physical abuse" is "any nonaccidental contact with a client which causes or
has the potential to cause physical pain or harm, including but not limited to hitting, kicking,
slapping, shoving, punching or choking;" "psychological abuse" is "any verbal or nonverbal
action by an employee which causes or has the foreseeable potential to cause a client emotional
distress including, but not limited to, teasing, taunting, name calling, threats, misuse of authority
or violation of client rights . . . ." (Def.'s 56.1 ¶¶ 15-16; Lee Aff., Ex. A.)

or evaluate any employees other than the investigators who assist in conducting reviews or investigations of incidents. (*Id.* ¶ 23, 26.) The Risk Manager has no authority to hire or terminate any employee, or to formally recommend termination of any employee. (*Id.* ¶ 27.) Instead, the Risk Manager investigates allegations of patient abuse, makes findings, and refers the findings to the Director of Quality Assurance. (*Id.* ¶¶ 25; Lee Aff. ¶ 5.)

To ensure that investigations are properly completed and that appropriate corrective actions are identified, the Policy establishes an Incident Review Committee ("IRC") composed of designated administrators and employees. (Def.'s 56.1 ¶ 17.) The IRC is empowered to initiate or order further investigation when necessary and to recommend plans of corrective action and of disciplinary action. (*Id.* ¶¶ 18-20.) Where the investigation involves Nursing Department personnel, the IRC may forward findings to the Director of Nursing, who has the authority to recommend termination of employment to the Kingsboro Executive Director. (*Id.* ¶ 21.)

Plaintiff began her employment at Kingsboro on December 7, 2000, as a Mental Health Therapy Aide ("MHTA") Trainee. (*Id.* ¶ 28.) MHTAs and MHTA Trainees work directly with mentally ill patients by assisting them with daily activities (i.e., bathing, dressing, and grooming), by accompanying them to therapy sessions, and by monitoring their safety. (*Id.* ¶ 39.) Approximately eighty-five to ninety percent of the MHTAs and MHTA Trainees at Kingsboro are African-American. (*Id.* ¶ 42.) Approximately ten to fifteen percent are Hispanic. (*Id.*) Approximately one percent are white. (*Id.*)

Appointment as an MHTA Trainee is a permanent appointment, conditioned upon the satisfactory completion of a one-year probationary term of service as a trainee. (*Id.* ¶ 29.) If the

3

MHTA Trainee successfully completes the one-year probationary period, she or he becomes an MHTA. (*Id.* ¶ 30.) MHTA Trainees are governed by the regulations and policies applicable to probationary employees, and additionally are governed by the regulations and policies applicable to traineeships. (*Id.* ¶ 34.) Specifically, under the New York Civil Service Regulations, a one-year traineeship may be extended only under limited circumstances. *See* 4 N.Y. Comp. Code R. & Regs. § 4.5(b)(5)(ii). Where an MHTA Trainee's conduct or performance is unsatisfactory, however, the Trainee's employment "may be terminated at any time after eight weeks and before completion of the maximum period of service." *Id.*

While an MHTA Trainee, Plaintiff received three formal evaluations from Kingsboro, approximately quarterly during her probationary period. (Def.'s 56.1 ¶¶ 44, 46-48.) Each report assigned a quantitative total behavior score indicating Plaintiff met the "expected level." (*Id.* ¶ 45.) However, each evaluation also stated she had room for improvement. Plaintiff's first evaluation, dated March 17, 2001, stated that she "needs to improve on her temperament in order to be able to accomodate [sic] some of the patient's [sic] verbal assaultiveness." (*Id.* ¶ 46; Aff. of Mahendra Jorawar in Support of Def.'s Mot. for Summary Judgment ("Jorawar Aff."), Ex. B.) Her second evaluation, dated July 9, 2001, criticized her patience and self control, and noted that "she needs to develop skills in working with resistant, anger provoking patients." (*Id.* ¶ 47; Jorawar Aff., Ex. C.)

On September 8, 2001, Plaintiff was tasked to monitor the room where patients were allowed to smoke cigarettes. (*Id.* ¶¶ 50-51.) Plaintiff's assignment was to let patients in and out of the room and to ensure that the patients did not fight with or hurt one another while in the room. (*Id.* ¶ 52.) Plaintiff allowed M.B., a patient with a history of assault and false accusations

4

of staff abuse, into the smoking room, despite the fact that M.B. had no cigarettes. (*Id.* ¶ 53.) M.B. then harassed other patients by attempting to take their cigarettes. (*Id.* ¶ 54.) M.B. became involved in an argument with another patient, R.H.. (*Id.* ¶ 55.) Plaintiff opened the door to the smoking room and reprimanded R.H., but she did not enter the smoking room, even as M.B. and R.H. cursed at and argued with one another for approximately ten minutes. (*Id.* ¶¶ 55-56.) When Plaintiff opened the door to the smoking room to allow another patient in, M.B. left the room and ran down the hall, alleging that she had been choked, and that she was going to report the incident to Geller, the Kingsboro Risk Manager. (*Id.* ¶¶ 59-60.) M.B. also stated that she would thereby "get everybody fired." (*Id.*) Two days later, on September 10, 2001, M.B. did report to Kingsboro staff members that Plaintiff had choked and threatened her. (*Id.* ¶ 62.)

On September 22, 2001, Kingsboro management evaluated Plaintiff's job performance for the third time. (*Id.* ¶ 48; Jorawar Aff., Ex. C.) The evaluation noted that, although Plaintiff's ability to work with angry and aggressive patients was improving, Plaintiff had received counseling for "inappropriate behavior" on May 13, 2001. (*Id.* ¶ 48.) It also listed a number of time and attendance issues, including unscheduled absences. (*Id.* ¶ 49.)

M.B.'s abuse allegation stemming from the events of September 8, 2001, was investigated by Geller and by Peter Ventre, Kingsboro Director of Education and Training. (*Id.* ¶ 65.) According to the investigation report, Ventre began the investigation because Geller was on vacation; Geller participated beginning on September 17, 2001, and ultimately authored the report. (Lee Aff., Ex. B.; Geller Aff. ¶ 7.) Together, Geller and Ventre interviewed at least ten individuals who were patients or staff members. (Def.'s 56.1 ¶ 66.) Ventre interviewed five patients, including M.B. and a first interview with R.H., and three employees other than Plaintiff.

5

(*Id.* ¶ 67.) Geller conducted interviews with Plaintiff and with a sixth patient, as well as a

follow-up interview with R.H. (*Id.* ¶ 68.) On the basis of these interviews, Geller ultimately

prepared a formal report on the investigation of M.B.'s allegations against Plaintiff. (*Id.* ¶ 85.)

Plaintiff has alleged that during her interview with Geller, who is white, Geller asked of

Plaintiff: "So, you don't like white people?" (*Id.* ¶ 83.) Plaintiff claims that she did not respond

to this alleged inquiry. (*Id.* ¶¶ 84.)

Ultimately, Geller's report made factual findings both for and against the allegations

raised. As a result of the investigation, Geller concluded that M.B.'s claim to have been choked

by Plaintiff was not substantiated by the evidence. (*Id.* ¶¶ 87-88.) During the investigation,

however, three patients (M.B., R.H., and D.S.) who had been in the smoking room during the

incident of September 8 described verbal abuse of M.B. by Plaintiff; they claimed that Plaintiff

had called M.B. a "fat pig," a "stinking fat ass," and a "bitch" and had told her to "shut up." (*Id.*

¶¶ 69-72.) Geller's report concluded from these statements that there was sufficient evidence

that Plaintiff had verbally abused M.B. (*Id.* ¶ 89; Lee Aff., Ex. B.) Geller's report then

recommended: (1) that Plaintiff be retrained in smoking room procedures; and (2) that Plaintiff

be referred to the Nursing Department and to Human Resources "for appropriate action." (Def.'s

56.1 ¶ 91; Lee Aff., Ex. B.) Geller's report did not recommend termination of Plaintiff's

employment. (Lee Aff., Ex. B.). Indeed, Geller has submitted an affidavit that she "did not

recommend that [Plaintiff] be terminated." (Geller Aff. ¶ 6.)

Kingsboro Director of Quality Assurance Kin Wah Lee reviewed Geller's report and

concurred in the findings and recommendations. (Def.'s 56.1 ¶ 94.) In addition, the IRC

received Geller's report and an IRC subcommittee that included Kingsboro Director of Nursing

Cheryl Moore met to review it in October 2001.  (*Id.* ¶ 95.)  As did Lee, the IRC subcommittee

agreed with the findings and recommendations of the report, and in late October referred it to

Kingsboro Director of Human Resources Mahendra Jorawar for action.  (*Id.* ¶ 97.)  Plaintiff's

traineeship period was due to expire in early December 2001, and Jorawar did not initiate

disciplinary action in advance of the determination of whether to retain Plaintiff at the end of her

traineeship.  (*Id.* ¶ 98-99.)

In November, Director of Nursing Moore recommended to Kingsboro Executive Director

Dean Weinstock that Plaintiff's employment be terminated.  (*Id.* ¶ 100.)  Weinstock approved

the recommendation, and Plaintiff was notified by letter dated November 21, 2001, that her

employment would be terminated effective December 5, 2001.  (*Id.* ¶ 101-02.)  After receipt of

the termination letter but prior to its effective date, Plaintiff asked to appear before the

Kingsboro Traineeship Council, which monitors the quality of training and evaluation of MHTA

Trainees and makes advisory recommendations regarding termination or retention of MHTA

Trainees.  (*Id.* ¶¶ 103-106.)

Meanwhile, on November 25, 2001, patient V.D. made an allegation to Kingsboro staff

that Plaintiff had cursed at him in the dining room, triggering a new investigation by Geller as

Risk Manager.  (*Id.* ¶ 109-10.)  Upon investigation, Geller found that the allegation was

corroborated by a staff member who witnessed the event.  (*Id.* ¶ 111.)  Geller reported this

finding to the IRC and completed an incident report, but did not write a formal investigatory

report.  (*Id.* ¶ 111; Geller Aff. ¶ 13; Lee Aff., Ex. C.)  Geller explains the lack of a formal

investigatory report to be because Plaintiff's employment with Kingsboro ended "before a report

could be written or action taken."  (Geller Aff. ¶ 13.)

Plaintiff met with the Traineeship Council on December 4, 2001. (Def.'s 56.1 ¶ 113.) She read a statement expressing her desire to retain her position and her remorse for the previous incidents, and answered questions from the Council members. (*Id.* ¶ 114; Dep. of Renee Love 149:15-150:18 ("Pl.'s Dep.").) The Council considered the two allegations of patient verbal abuse made against Plaintiff, as well as absences averaging once a month and two instances of late arrivals. (Def.'s 56.1 ¶ 115.) A majority of the Council members wanted to extend Plaintiff's probationary period by six months and Kingsboro Director of Administration Don Holford agreed to investigate the legal feasibility of an extension. (*Id.* ¶¶ 117-18.) The Council also voted, however, to recommend termination of Plaintiff's employment in the event such an extension was not possible. (*Id.* ¶ 119.)

Kingsboro management determined that, under New York State law and/or regulations, it lacked the power to extend an MHTA Trainee's probationary period and therefore was required either to terminate Plaintiff or to advance her to permanent MHTA status. (*Id.* ¶ 120.) Director of Nursing Moore did not change her November recommendation to terminate and Executive Director Weinstock did not change his approval of such recommendation. (*Id.* ¶¶ 120.) Plaintiff resigned effective that same day, December 4, 2001, in lieu of her employment being terminated the following day. (*Id.* ¶ 122.)

Kingsboro did not hire another MHTA or MHTA Trainee until March 28, 2002, at which point two MHTA Trainees were hired. (*Id.* ¶¶ 123-24.) One of the new hires was African American, and the other Hispanic. (*Id.*) Two more MHTA Trainees were hired on May 23, 2002, both of whom were African American. (*Id.* ¶ 125.) One additional MHTA Trainee was hired on July 25, 2002, who was white. (*Id.* ¶ 126.)

B. Procedural History

Plaintiff filed her Complaint on August 4, 2003. She filed an Amended Complaint on September 30, 2003 and a Second Amended Complaint on December 15, 2003. Defendant New York State Office of Mental Health ("OMH") filed an Answer on February 25, 2004.[2] On September 8, 2004, this case was reassigned to the undersigned. Following completion of discovery, Defendant OMH filed this Motion for Summary Judgment (Docket No. 35).

This District's local rules require a defendant moving for summary judgment where a plaintiff is pro se to notify such plaintiff of the consequences of failure to reply to the motion. *See* Local Civ. R. 56.2. The rule requires notice by mechanism of a specific form to be served and filed with the moving papers, *id.*, and Defendant's counsel did serve and file such required notice here. (Docket No. 38.)[3] Thus, Plaintiff was appropriately appraised of the consequences

---

[2] Plaintiff's Second Amended Complaint named as additional defendants Cheryl Moore and Maureen Geller. Plaintiff's claims against Moore and Geller were dismissed by Order of the Honorable Shira A. Scheindlin dated June 8, 2004.

[3] In addition, the Court wrote a letter to Plaintiff dated May 27, 2005, in recognition that Plaintiff may have mistaken a previously submitted pre-motion letter for a response to Defendant's later-submitted Motion. The Court's letter read, in part:

> Defendant OMH will be filing a motion for summary judgment. The motion is now due on June 24, 2005. *Your response is due on August 5, 2005.* This is your opportunity to respond to the arguments that Defendant OMH makes in its June 24, 2005 motion papers. You may choose to make some of the arguments you already made in your previous March 10, 2005 letter, or you may have new and additional arguments in response to OMH's motion. What you say is entirely up to you. If you feel that you have already made all the arguments you want in your March 10, 2005 letter and do not have any additional arguments, please just let me know that by August 5, 2005. OMH will then have an opportunity to reply to your arguments, due August 19, 2005. I will then review the submissions, and rule on the motion.

9

of summary judgment. *See Jonas v. Int'l Airline Employees F.C.U.*, No. 03-CV-3374, 2006 WL 1409721, at *2 (S.D.N.Y. May 19, 2006).

Although Plaintiff's subsequent submissions did not take the form of an affidavit, the Court construes these documents as Plaintiff's statement of facts. Because of the liberal pleading standards for pro se parties, the Court looks to the cumulative contents of the following documents as the basis for Plaintiff's opposition to this Motion: (1) Plaintiff's "Motion to Deny Summary Judgment" dated March 10, 2005 (Docket No. 48 ) ("Pl.'s Opp'n, Mar. 10, 2005"); (2) Plaintiff's "Notice of Motion to Deny Summary Judgment" dated August 19, 2005 (Docket No. 40) ("Pl.'s Opp'n, Aug. 19, 2005"); (3) Plaintiff's "Supplement to Plaintiff['s] Opposition to Motion for Summary Judgment" dated September 29, 2005 (Docket No. 43) ("Pl.'s Opp'n Supp."); and (4) Plaintiff's letter to the Court dated August 17, 2006 (Docket No. 49 ) ("Pl.'s 2006 Supp."). *See Ryan v. Lyder*, No. 01-CV-10057, 2002 WL 1990780, at *1 (S.D.N.Y. Aug. 28, 2002) (holding arguments and exhibits contained in letters by pro se plaintiff to be in opposition to defendant's motion to dismiss). In addition, by request of the Court made at oral argument, Defendant provided to the Court complete transcripts of all depositions in this case, which supplemented the excerpts previously submitted by Defendant.

## II.  Discussion

### A.  Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view

all evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in his or her favor. *See Tufariello v. Long Island R.R.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in [her] favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'" *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zen*ith Radio Corp., 475 U.S. 574, 586-87 (1986)).

   The materiality of the facts considered by the Court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006); *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be to "isolate and dispose of factually unsupported claims." *Celotex Corp.*, 477 U.S. at 323-24.

Courts are obligated to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *see also Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) ("[A]n extra measure of caution is merited in . . . summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions.") Nevertheless, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Though district courts must pay careful attention to affidavits and depositions that may reveal circumstantial proof of discrimination, *see Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994), courts are not to "treat discrimination differently from other ultimate questions of fact," *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Pro se parties are properly given "extra consideration" and "special latitude" on summary judgment motions. *Salahuddin v. Coughlin*, 999 F. Supp 526, 535 (S.D.N.Y. 1998) (internal quotation marks omitted). Therefore, this Court must read a pro se litigant's supporting papers liberally, interpreting them "to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). This does not, however, "relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted). In particular, "a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for

12

summary judgment." *Lyerly v. Koenigsmann*, No. 04-CV-3904, 2006 WL 1997709, at *2 (S.D.N.Y. July 17, 2006) (internal quotation marks omitted).

B. Analysis

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Plaintiff may establish a prima facie case of racial discrimination under Title VII by pleading the elements of the test announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* test requires that a plaintiff show: "[1] she is a member of a protected class; [2] she was qualified for her position; [3] she suffered an adverse employment action; and [4] the action occurred under circumstances giving rise to an inference of discrimination." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999); *see also McDonnell Douglas*, 411 U.S. at 802. Plaintiff's burden in establishing a prima facie case is "de minimis." *Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002). However, a party's "bald assertions," without more, are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *During v. City Univ. of N.Y.*, No. 01-CV-9584, 2005 WL 2276875, at *4, *8-9 (S.D.N.Y. Sept. 19, 2005) (granting summary judgment on discrimination claim where only evidence was conclusory allegations of plaintiff).

13

Where a plaintiff satisfies this initial burden, the burden of production (but not persuasion) shifts to the employer to articulate a legitimate, non-discriminatory reason for the action. *See Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). If the employer carries this burden, the burden of production shifts back to the plaintiff to demonstrate that the legitimate reasons offered are pretextual. *Id.* The ultimate burden of persuading the trier of fact that a defendant employer intentionally discriminated against a plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational finder of fact to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate. *Id.*

In this case, Plaintiff is an African-American female who was terminated from her job, and so there is no dispute that she "satisfied the first and third elements of her prima facie case, *i.e.*, she is a member of a protected class who suffered an adverse employment action." *Norville*, 196 F.3d at 95. Defendant also does not dispute that Plaintiff was qualified to serve as an MHTA or an MHTA Trainee, nor that Plaintiff's performance evaluations were mostly positive, notwithstanding particular negative remarks (discussed, *supra*, as factual history).

Defendant focuses its argument on the fourth and final element of the *McDonnell Douglas* test. To establish this element of her prima facie case, Plaintiff must show that her termination was the product of racial discrimination. *See Gorham v. Transit Workers Union*, No. 98-CV-313, 1999 WL 163567, at *4 (S.D.N.Y. Mar. 24, 1999). "[U]nfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable." *Nakis v. Potter*, No. 01-CV-10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004) (citing *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)). To fashion her prima facie

14

case, and thereby shift the burden of production to Defendant, Plaintiff must merely establish an inference of discrimination. *See Norville*, 196 F.3d at 95. Though not required, this is most commonly done by demonstrating that other similarly situated persons who were not members of the plaintiff's protected class (in this case, of Plaintiff's race) were treated more favorably than the plaintiff in the workplace. *See Abdu-Brisson*, 239 F.3d at 467-68 ("[S]howing of disparate treatment is probably the most common way to create an inference of discrimination . . . ."). For employees to be "similarly situated," they "'must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to'" Plaintiff's. *See Norville*, 196 F.3d at 96 (quoting *Mazzella v. RCA Global Comm'cns Inc.*, 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986)).

   Plaintiff has not shown that any similarly situated individuals not of her protected class were given different, let alone preferential, treatment. Plaintiff makes a vague allegation of disparate treatment, claiming that the MHTA who reported Plaintiff's alleged verbal abuse of patient V.D. had a patient under his supervision attempt suicide and that this MHTA was not terminated. (Pl.'s Opp'n, Aug. 19, 2005 at 3.) Plaintiff does not, however, present any information to corroborate this allegation. Nor does she present any evidence that this MHTA was not a member of the protected class on the basis of which Plaintiff claims that she was discriminated, let alone evidence that there was any misconduct by the other MHTA. Plaintiff cannot manufacture evidence of disparate treatment from conclusory and bare assertions of discrimination. *See Patterson*, 375 F.3d at 219 ("[A] genuine issue [for trial cannot be] created merely by presentation of assertions that are conclusory."); *Hawana v. City of N.Y.*, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002) ("[P]laintiff's personal conclusory assumptions are insufficient to

support such an inference [of discriminatory motive]."). Even assuming in Plaintiff's favor that

the MHTA was one of the "white workers" who Plaintiff generally asserts enjoyed a "double

standard in discipline" (Pl.'s Opp'n, Aug. 19, 2005 at 3), there is no evidence that he was a

trainee or in his probationary period. In addition, the conduct Plaintiff alleges should have

precipitated dismissal of the other MHTA – failing to prevent a suicide – is, on its face, quite

different from that at issue in the course of Plaintiff's employment. In light of these many

distinctions, the Court cannot look to the other, unidentified MHTA as "similarly situated." *See

Norville*, 196 F.3d at 96.[4]

  Plaintiff offers only one solitary fact as basis for her broad allegations of discriminatory

conduct by Defendant: an inquiry allegedly made by Geller during her investigation of M.B.'s

allegation of abuse in which she asked Plaintiff, "[I]s it true that you do not like white people?"

(Second Am. Compl. at 4.) Plaintiff attempts to bolster the actionable import of this isolated

question with the deposition testimony of Brian Smith ("Smith"), a risk management staff

member at Kingsboro who did not know Plaintiff, and the deposition testimony of Wendell Scott

("Scott"), an employee in Kingsboro's Human Relations department who did know Plaintiff

during her tenure at Kingsboro but did not supervise her. (Pl.'s Opp'n Aug. 19, 2005; Pl.'s

Opp'n Supp.; Pl.'s 2006 Supp.")

  Plaintiff's primary argument is that Smith and Scott's testimony regarding Geller's

---

[4] Plaintiff's difficulty in finding a similarly-situated individual not of her class is understandable, as, according to her own estimates, approximately ninety-seven percent of the Kingsboro staff is African-American. (Pl.'s Opp'n Mar. 10, 2005 at 3.) Defendant states that eighty-five to ninety percent of Kingsboro MHTAs and MHTA Trainees are African-American. (Def.'s 56.1 ¶ 17.) Regardless, statistical challenge to finding an out-of-class similarly-situated employee does not excuse Plaintiff's obligation to present some evidence of discriminatory conduct by Defendant.

"slanting" of investigations is evidence of racial bias. Smith, who was himself terminated from Kingsboro prior to Plaintiff's first incident of verbal abuse, alleged generally that Geller was prone to "adding things into [employee investigations] that couldn't possibly be there . . . that she didn't have a right to add because she was not there." (Reply Decl. of Michael E. Peeples ("Def.'s Reply Decl."), Ex. A at 60:15-22. ("Smith Dep.").) Scott stated that "it was a widely held belief among Geller's own staff that . . . her investigative reports often reported unfairly against staff." (Def.'s Reply Decl., Ex. B at 34:9-11. ("Scott Dep.").) Plaintiff suggests that these statements can be used as evidence that Geller's investigative report regarding Plaintiff was fabricated. (Pl.'s Opp'n Aug. 19, 2005.)

First, it is doubtful that Plaintiff could introduce at trial the portion of Scott's testimony discussing the "widely held belief" of others under the Federal Rules of Evidence. *See* Fed. R. Evid. 802 (stating hearsay evidence not generally admissible). Second, Plaintiff would face an uphill battle to link to her termination to claims that Geller fabricated evidence and conclusions given that: (1) Geller interviewed only some of the witnesses who reported that Plaintiff had acted improperly (Ventre interviewed five patients and three employees for the report) (Lee Aff., Ex. B.; Geller Aff. ¶¶ 66-68); (2) Geller's report rejected as unsubstantiated M.B.'s claim to have been choked by Plaintiff, showing that Geller critically evaluated the evidence presented in preparation of her report (Lee Aff., Ex. B.); and (3) Geller's report did not recommend termination of Plaintiff's employment, (*Id.*).

Even setting aside these major problems with Plaintiff's treatment of the evidence, basing personnel decisions on subjective or incorrect factors still does not violate Title VII unless unlawful discrimination is also present. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.

17

2001) ("It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it

occurs because of an employee's . . . protected characteristic."); *Nakis*, 2004 WL 2903718, at

\*20 ("Hostility or unfairness in the workplace that is not the result of discrimination against a

protected characteristic is simply not actionable."); *Gorham*, 1999 WL 163567, at \*4 (granting

summary judgment on Title VII claim where plaintiff failed to raise a genuine issue of material

fact that alleged adverse action was motivated by racial bias).  Therefore, even if it were true that

Geller was untruthful or "slanted" her reports (something Geller denies), this would be irrelevant

for the purposes of this litigation unless Plaintiff could establish the "slanting" was the result of

racial animus.  There is no evidence from Scott or Smith, however, that Geller's alleged slanting

of reports was the result of racial discrimination.

   The only specific allegations from the depositions regarding racial animus are:

(1) Smith's statement that Geller made one derogatory but ambiguous statement about another

employee that he considered potentially racist (Smith Dep. at 66:21-72:16), and (2) Scott's

discussion of a petition that was sent to Weinstock as Kingsboro Executive Director on August

12, 2002, alleging that Geller was biased against African Americans and Hispanics. (Scott Dep.

at 96:19-99:2;  Def.'s Reply Decl., Ex. C.)  "While it is true that the stray marks of a decision-

maker, without more, cannot prove a claim of employment discrimination, [the Second Circuit

has] held that when other indicia of discrimination are properly presented . . . the jury has a right

to conclude that [the remarks] bear a more ominous significance.'" *Abdu-Brisson,* 239 F.3d at

468.  When the individual making the stray remarks holds only a limited role in the termination

process, however, that decision-maker's alleged racial animus is insufficient to support a finding

that the termination decision was made because of discrimination.  *See Thermidor v. Beth Israel*

*Med. Ctr.*, 683 F. Supp. 403, 413 (S.D.N.Y. 1988). Here, Plaintiff's own allegations of racism include a single stray question, which Defendant strenuously argues could be interpreted in several ways. Regardless, the most that Plaintiff offers is the single question by Geller. Thus, she relies on the deposition testimony of Smith and Scott to provide the necessary "other indicia of discrimination." Neither Smith nor Scott's testimony, however, even when coupled with Geller's alleged statement to Plaintiff, is sufficient to raise an inference that Plaintiff's termination was the result of racial discrimination.

Smith's deposition testimony about Plaintiff's alleged statements is insufficient as a matter of law to raise an inference of discrimination. The remark that Plaintiff alleges is proof of racism was that Geller once said to Smith "what do you expect from that kind of person." (Smith Dep. 66:4-65, 67:11-20.) Smith himself was unclear whether the remark was race-based, although he considered it racist. (*Id.*) However, Smith also testified that he could not remember whether Geller had ever made racially derogatory remarks (*id.* 66:24), and that he had no knowledge that Geller had ever "slanted" an investigation due to racial bias (*id.* 72:15-73:4.). Smith also stated that he had no knowledge of any racial bias in the investigation of Plaintiff and acknowledged that he "wasn't even there when all this was going on." (*Id.* 64:6, 73:21.) Drawing all inferences in favor of the Plaintiff, the only evidence added by Smith is one alleged additional "stray remark" of questionable probative value. Thus, unless Scott's testimony and the petition letter he discusses, (Def.'s Reply Decl., Ex. C), would provide other indicia of discrimination, Plaintiff has failed to establish her prima facie case. *See Abdu-Brisson,* 239 F.3d at 468 (stating "stray remarks" must be buttressed with other evidence of discrimination to fashion prima facie case).

19

In Scott's testimony, he adamantly denied that Plaintiff was dismissed because of her race. (Scott Dep. 91:14.) In fact, when asked if he had "any reason to believe that [Plaintiff] was dismissed because of her race," Scott replied, "Hell, no. No. No . . . ." (Scott Dep. 91.) He did, however, acknowledge that some Kingsboro staff members felt that Geller was biased. (*Id.* 96:5-9.) Specifically, he discussed a petition alleging racial bias on the part of Geller that was sent to the Kingsboro Executive Director on August 12, 2002 – the buttressing evidence on which Plaintiff relies. This petition, signed by numerous employees (but not Scott), alleged that Geller was biased in her investigations of minority employees at Kingsboro. (Def.'s Reply Decl., Ex. C.) The letter is not, however, evidence of discriminatory animus in Plaintiff's case for numerous reasons. First, the only testimony specific to Plaintiff's case is unequivocal: No witness knew of any bias during the investigation. Second, the letter was sent more than eight months after Plaintiff's termination, and there is no evidence linking the allegations in the letter to the investigation of Plaintiff. Importantly, both Scott and Smith denied any such link. In addition, events that occur long after an allegedly discriminatory act have little probative value when determining prior discriminatory intent. *See Di Cola v. SwissRe Holding (North America), Inc.*, No. 90-CV-3211, 1992 WL 197403, at *5 (S.D.N.Y. Aug. 5, 1992) (holding events postdating plaintiffs termination by three years irrelevant as a matter of law). Finally, the allegations in the letter are insufficiently specific to be verifiable and are rank hearsay and wholly unauthenticated. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 361 (S.D.N.Y. 2006) ("This letter is unauthenticated and is hearsay, and should not be considered as evidence in support of a motion for summary judgment."). Therefore, they are insufficient for Plaintiff to survive summary judgment. *See Cooper v. Morgenthau*, No. 99-CV-11946, 2001 WL 868003,

at *6 (S.D.N.Y. July 31, 2001) ("[Plaintiff] may not rely on general allegations that [defendant's

manager] favored white employees in assigning work or favorable benefits decisions to support

her claim of pretext."). Although numerous employees signed the petition, general allegations

do not become actionable simply because they are made by a multitude of voices.

Even if there was conclusive evidence of Geller's racism, there is not evidence that

Geller had more than an indirect influence on Plaintiff's termination. In fact, Geller's report did

not even recommend termination, but instead it is undisputed that the initial recommendation for

Plaintiff's termination came from Cheryl Moore, Director of Nursing, not from Geller. Although

it is reasonable to infer that the investigation affected Moore's determination, it is unreasonable

to infer that, even assuming Geller harbored racial bias, Geller's racism led to Plaintiff's

termination. Every witness in the case denies that conclusion except for Plaintiff, who herself

provides no evidence of racism in the termination decision. Geller did not conduct the

investigation on her own, and its conclusions were reviewed by numerous other members of

Kingsboro managment, none of whom Plaintiff alleges harbored racial bias. Indeed, Plaintiff has

not disputed Defendant's account of events at the Traineeship Council. There, although a

majority of Council members sought to extend Plaintiff's probationary period by six months, the

Council was unwilling to allow Plaintiff to proceed from probationary to permanent status if

Kingsboro management determined – as Don Holford later did determine – that the law did not

permit the extension of Plaintiff's probationary term. Thus, there is no evidence that Geller

played anything other than a limited and ministerial role in the ultimate decision to terminate

Plaintiff. Where allegedly discriminatory statements are made by those not involved with a

termination decision, there is no inference of discrimination. *See Khan v. Abercrombie & Fitch,*

21

*Inc.*, No. 01-CV-6163, 2003 WL 22149527, at *7 (S.D.N.Y. Sept. 17, 2003) (holding that alleged discriminatory insults by person who played no role in employer's decision to terminate Plaintiff "do not raise an inference of discrimination"); *see also Boyle v. McCann-Erickson, Inc.*, 949 F. Supp. 1095, 1102 (S.D.N.Y. 1997) (applying rule to ADEA claim). Plaintiff has not alleged that the Director of Nursing, who recommended her termination, nor the Executive Director, who approved it, were racially biased.

Thus, Plaintiff has failed to establish a prima facie case of discrimination. Although Plaintiff's burden is *de minimis*, both of the witnesses upon which Plaintiff relies deny any racial bias in the investigation of Plaintiff or in Kingsboro's decision to terminate her. Even if the Court assumes racial bias did affect the investigation, there is no evidence that the conclusions of the investigation, which were approved by numerous other officials at Kingsboro, were tainted or inaccurate. Thus, there is insufficient evidence for any reasonable finder of fact to link racial bias to Kingsboro's termination of Plaintiff's employment. Accordingly, Plaintiff's claim fails as a matter of law.

Even assuming, however, that Plaintiff had sufficiently met her prima facie burden, her claim would still fail. If Plaintiff met her burden, the burden of production would then shift to Kingsboro to "proffer a nondiscriminatory reason for its action." *James v. N.Y. Racing Assoc.*, 233 F.3d 149, 154 (2d Cir. 2000). Here, Defendant has shown a nondiscriminatory reason for terminating Plaintiff: namely, her verbal abuse of two patients, along with her absences. The record clearly shows that Plaintiff lacked patience, while working in a position where patience was critical to the State's humane treatment of mentally ill persons under its care. *See* N.Y. Mental Hygiene Law § 7.21(b) (charging Kingsboro executive director with "the responsibility

of seeing that there is humane treatment of the patients at his facility"). Plaintiff's temper on the job was evident from the two separate abuse investigations as well as in Plaintiff's evaluations throughout her probationary period. (Def.'s 56.1 ¶¶ 46, 111; Jorawar Aff., Exs. B, C, D.)

"[O]nce the employer articulates a non-discriminatory reason for its actions, the [*McDonnell Douglas*] presumption completely drops out of the picture" *James*, 233 F.3d at 154 (internal quotation marks and citation omitted). The plaintiff retains the burden of persuading the trier of fact that the defendant's discrimination was intentional, and must "point to evidence that reasonably supports a finding of prohibited discrimination" to avoid an award of summary judgment to the defendant. *Id.*; *see also Oppenheim v. Gutteridge*, 225 F. Supp. 2d 185, 189-90 (D. Conn. 2002) ("Thus, the burden shifts to plaintiff to demonstrate that the proffered reason is false and that the nonrenewal was motivated at least in part by discrimination.").

The only evidence of pretext offered by Plaintiff, other than that discussed above, is the fact that Defendant offered training in "Preventing and Managing Crisis Situations" two years after her termination. (Pl.'s Opp'n Aug. 19, 2005.) There is no evidence linking this training to Plaintiff's termination or to racial bias at Kingsboro. Even if there was, general remedial measures are not typically evidence of discriminatory intent. *Cf. Argueta v. N. Shore Long Island Jewish Health Care Sys. Inc.*, No. 01-CV-4031, 2003 WL 22670915, at *5 (E.D.N.Y. Nov. 6, 2003) ("[I]t would be both unwise and unfair to employers to treat every accommodation made in response to an allegation of discrimination as an admission of discrimination. Such an approach would discourage (by penalizing) precisely the sort of behavior the law should encourage."). Thus, Plaintiff has also failed to establish that Defendant's non-discriminatory

reasons for her termination were pretextual.[5]

In the end, no reasonable jury could find other than that Defendant terminated Plaintiff because she failed to prove she could patiently work with mentally ill patients who required special care. These patients were verbally assaultive to each other and to staff members. Defendant could not, therefore, consistent with its mission of humane care, tolerate an MHTA who herself verbally assaulted patients. Defendant relied on evidence that many witnesses observed Plaintiff mistreating patients on two separate occasions. And, it was senior management who elected to terminate Plaintiff while Geller, who allegedly asked the question that has upset Plaintiff and forms the exclusive factually-alleged basis of Plaintiff's racial animus argument, made no such decision. In fact, Defendant initially sought to extend Plaintiff's probationary period in lieu of terminating her employment. Only when legal limitations, the fact of which Plaintiff does not contest, precluded such a path did Kingsboro management finally determine it had no choice but to terminate Plaintiff.

---

[5] Defendant's actual hiring pattern of MHTA Trainees following Plaintiff's termination further supports Defendant's termination rationale as non-pretextual. Of the five MHTA Trainees hired following Plaintiff's termination, three were African-American, one was Hispanic, and one was white (the fifth in the sequence).

### III.  Conclusion

Plaintiff has presented no evidence from which a reasonable jury could find that Plaintiff's termination was a result of unlawful discrimination.  Therefore, Defendant's Motion for Summary Judgment is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion (Docket No. 35), to grant judgment for Defendant, and to close the case.

SO ORDERED.

Dated:       February 26, 2008
             White Plains, New York

             _____
             KENNETH M. KARAS
             UNITED STATES DISTRICT JUDGE

Service List:
Ms. Reneé Love
2955 8th Avenue, #30 F
New York, N.Y. 10039

Michael E. Peeples, Esq.
Assistant Attorney General
State of New York
120 Broadway
New York, N.Y. 10271